2003 WY 113

**Wilbur K. WARNICK; Dee J. Warnick; and Warnick Ranches, Appellants (Defendants),**

v.

**Randall M. WARNICK, Appellee (Plaintiff).**

**Randall M. Warnick, Appellant (Plaintiff),**

v.

**Wilbur K. Warnick, Dee J. Warnick, and Warnick Ranches, Appellees (Defendants).**

**Nos. 02–131, 02–155.**

Supreme Court of Wyoming.

Sept. 11, 2003.

Representing Appellant: Dennis M. Kirven of Kirven and Kirven, P.C., Buffalo, Wyoming.

Representing Appellee: Timothy C. Kingston of Graves, Miller & Kingston, P.C., Cheyenne, Wyoming; Charles E. Graves, Sheridan, Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

GOLDEN, Justice.

[¶1]   A general partner in a family ranch business sued the partnership and the other two partners on various contract, quasi-contract and partnership theories, seeking recovery of his partnership interest.   On cross motions for summary judgment, the district court granted Plaintiff's motion, found that dissociation and buyout of the Plaintiff was the appropriate remedy and entered judgment in the amount of $230,819.14 for his share of the ranch's value.   Defendants appealed; Plaintiff cross-appealed the calculation of his partnership share.   Finding that the district court erred in its calculation of the buyout price of the dissociated partner's interest, we reverse in part and remand with instructions.

## ISSUES

[¶2]   Wilbur and Dee Warnick, along with Warnick Ranches, state the issues as follows:

A.   Did the District Court err in failing to accrue interest on additional cash contributions made by each of the partners to Warnick Ranches in accordance with W.S. § 17–21–401(e) when calculating the buyout of a disassociated partner?

B.   Were guaranteed payments attributed to Wilbur Warnick and left in the Warnick Ranch Partnership (unpaid) additional cash contributions as either capital or loans?

C.   If additional cash contributions were not loans under W.S. § 17–21–401(d), did the District Court err in granting summary judgment when genuine issues of material fact exist concerning the capital

accounts in the Warnick Ranch Partnership?

Randall Warnick re-frames the issues:

1. Did cash payments made by the Appellants constitute interest-bearing loans?
2. Is there a genuine issue of material fact regarding the parties' respective ownership interests or financial stakes in the partnership?
3. Should several guaranteed payments to one of the partners be considered cash contributions or loans to the partnership?
4. Did the District Court incorrectly exercise its "equitable discretion" when it reduced the amount that the Appellee was entitled to from the total value of the partnership?

## FACTS

[¶ 3] In August 1978, Wilbur and Dee Warnick and their son Randall Warnick contracted to purchase a ranch in Sheridan County for an agreed price of $335,000, with $90,000 down plus $245,000 in installments over ten years at 8% interest. In April 1979, they formed Warnick Ranches general partnership to operate the ranch and complete the installment purchase agreement. The partnership agreement recited that the initial capital contributions of the partners totaled $60,000, paid 36% by Wilbur, 30% by Dee, and 34% by Randall.

[¶ 4] The partnership leased out the ranch property for the first two years. Wilbur and Dee Warnick then moved onto the ranch in 1981, living there and working the ranch up to the present time. Randall lived and worked on the ranch during the 1981 and 1982 summer haying seasons and again from 1991 to 1998.

[¶ 5] The partners over the years each contributed additional funds to the operation of the ranch and received cash distributions from the partnership. After 1983, Randall contributed very little new money and almost all of the additional funds to pay off the mortgage came from Wilbur and Dee Warnick. Wilbur also left in the partnership account two $12,000 cash distributions that were otherwise payable to him. The net cash contributions of the partners through 1999, considering the initial contributions, payments to or on behalf of the partnership, draws not taken and distributions from the partnership were:

Wilbur      $170,112.60  (51%)
Dee          138,834.63  (41%)
Randall       25,406.28  ( 8%)

[¶ 6] In 1998, Randall Warnick began having discussions with his brother about the possibility of selling his interest in Warnick Ranches. When Randall mentioned this to his father, a dispute arose between them concerning the percentage of the partnership that Randall owned. Finally, on April 14, 1999, Randall's attorney sent a letter to Warnick Ranches which stated:

I have been asked to contact you regarding [Randall's] desire to either sell his interest in the ranch to a third party, to the partnership, or to liquidate the partnership under Paragraph 12 of the partnership agreement.

* * * * [I]t would appear that it would be in the best interests of all to amicably agree to a selling price of his interest either to a third party or to the partnership as provided in the partnership agreement.

[¶ 7] On August 11, 1999, Warnick Ranches responded in writing, treating the letter from Randall's attorney as the expressed will of a partner to dissociate. The partnership's response included a tender offer for Randall's share, as provided under Wyo. Stat. Ann. § 17–21–701(e) and (g) in the case of a dissociating partner. Randall in turn exercised his right under § 17–21–701(j) to reject the tender and bring an action against the partnership to determine his interest in the partnership, including a buyout price if he is determined to be dissociated from the partnership.

[¶ 8] The case was submitted to the district court on cross motions for summary judgment. The parties stipulated to facts regarding the cash flows into and out of the partnership accounts, as well as the partnership tax returns for each year from 1979 through 1999. They also submitted affidavits, depositions, interrogatories and requests

for admission in support of their respective motions.

[¶ 9] The district court, in granting Randall Warnick's motion for summary judgment, found that dissociation of Randall as a partner was the appropriate remedy and that the schedule of ownership recited in the partnership agreement, absent evidence of any other written agreement, controls the partners' percentage upon dissolution or dissociation. The court awarded judgment to Randall Warnick for the amount of his cash contributions, plus 34% of the partnership assets' increase in value above all partners' cash contributions. As a result of that calculation, $230,819.14, or 25.24%, of the undisputed value of the partnership was awarded to Randall, without provision of interest for any partner in the calculation.

## DISCUSSION

### Standard of Review

[¶ 10] We recently reiterated our "well-settled" standard of review for considering the grant of a summary judgment.

> When a motion for summary judgment is before the supreme court, we have exactly the same duty as the district judge; and, if there is a complete record before us, we have exactly the same material as did he. We must follow the same standards. The propriety of granting a motion for summary judgment depends upon the correctness of a court's dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. This court looks at the record from the viewpoint most favorable to the party opposing the motion, giving to him all favorable inferences to be drawn from the facts contained in affidavits, depositions and other proper material appearing in the record. We separate the formal and pretended from the genuine and substantial so only the latter may be considered in eliminating the burden of a formal trial if only questions of law are left to decide; there must be no issue of material fact to decide. *Weaver v. Blue Cross–Blue Shield,* Wyo., 609 P.2d 984, 986–987 (1980). A material fact, ex-

pressed in various ways, is one having legal significance which would in a given case control the legal relations of the parties; one upon which the outcome of the litigation depends in whole or in part; one on which the controversy may be determined; one which will affect the result or outcome of the case depending upon its resolution; or one which constitutes a part of the plaintiff's cause of action or the defendant's defense. *Johnson v. Soulis,* Wyo., 542 P.2d 867 (1975). Summary judgment affords an opportunity for prompt disposition of a lawsuit in its early stages, permitting an end to unfounded claims and avoiding the expense of a full-fledged trial to both litigants and the state's judicial machinery. *Bluejacket v. Carney,* Wyo., 550 P.2d 494 (1976).

*McLean v. Hyland Enterprises, Inc.,* 2001 WY 111, ¶ 14, 34 P.3d 1262, ¶ 14 (Wyo.2001) (quoting *Reno Livestock Corp. v. Sun Oil Co. (Delaware),* 638 P.2d 147, 150–51 (Wyo. 1981)).

[¶ 11] We also discussed in *McLean* the general rule that the denial of a summary judgment motion is not an appealable final order. However, "when the district court grants one party's motion for a summary judgment and denies the opposing party's motion for a summary judgment and the district court's decision completely resolves the case, both the grant and the denial of the motions for a summary judgment are subject to appeal." *McLean,* ¶ 17 (quoting *Lieberman v. Wyoming.com LLC,* 11 P.3d 353, 356 (Wyo.2000)). We will therefore review the entire case, including the denial of the defendants' summary judgment motion.

### Statutory Provisions

[¶ 12] Resolution of this matter relies almost entirely on application of the Wyoming Revised Uniform Partnership Act ("RUPA"), Wyo. Stat. Ann. §§ 17–21–101 *et seq.* (LexisNexis 2003), which the Wyoming legislature adopted in 1994 as a replacement for the Uniform Partnership Act.1993 Wyo. Sess. Laws ch. 194. RUPA is applicable in this case because by its terms it applies "to all partnerships in existence on January 1, 1994, that were formed under the Wyoming Part-

nership Act or any predecessor law providing for the formation, operation and liquidation of partnerships." § 17–21–1003(a). RUPA states in pertinent part:

[A] partnership agreement governs relations among the partners and between the partners and the partnership. To the extent the partnership agreement does not otherwise provide, this chapter governs relations among the partners and between the partners and the partnership.

§ 17–21–103(a). "The Revised Act is, therefore, largely a series of 'default rules' that govern the relations among partners in situations they have not addressed in a partnership agreement." Uniform Partnership Act, Pref. Note, 6 U.L.A. 6–7 (1997). *See also, B & R Builders v. Beilgard,* 915 P.2d 1195, 1197 (Wyo.1996).

[¶ 13] During the existence of the partnership, each partner has authority to act on behalf of the partnership, §§ 17–21–301, 401(f), and "[a]ll partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law." § 17–21–306(a). "A partner may lend money to and transact other business with the partnership," § 17–21–404(f), and "[a] partnership shall repay a partner who, in aid of the partnership, makes a payment or advance beyond the amount of capital the partner agreed to contribute." § 17–21–401(d). Such a payment or advance by a partner constitutes a loan to the partnership which accrues interest from the date of the payment or advance. § 17–21–401(e).

[¶ 14] The provisions of the Warnick Ranches Partnership Agreement addressing the above subjects are paragraphs six and nine, which state:

6. *CAPITAL CONTRIBUTION.* The parties hereto hereby agree to contribute the personal property listed on Exhibit "A" attached hereto to the Partnership to be used in the Partnership business. By unanimous agreement of all Partners, additional contributions may be made to, or withdrawals may be made from, the capital of the Partnership.

\* \* \* \*

9. *ACCOUNTING.* On December 31 of each year, the accounts of the Partnership business will be closed for the year. As of that date, the Partnership income and expenses will be totaled and the difference shall be divided among the Partners on any basis which is mutually agreed upon by all Partners, giving due consideration to services rendered during the year by each Partner, drawings during the year by each Partner and the amount of capital invested by each Partner during such year.

The partnership agreement is entirely silent as to how cash advances or payments on behalf of the business are to be treated. The partners knew that additional cash would be needed to make the mortgage payments on the ranch, and perhaps assumed that paragraph six of their agreement would cover the additional funds when they would unanimously agree to adjust the capital accounts when a partner paid more money into the operation.

[¶ 15] It is, however, undisputed that the partners never entered into a unanimous agreement to amend their partnership agreement or to reflect additional capital contributions. It is also undisputed that the advances by the partners were not anywhere documented as a loan to the partnership rather than capital contributions. The district court found these facts dispositive in granting Randall Warnick's summary judgment motion. The court specifically found that there was no documentation to support a conclusion that the payments by the elder Warnicks were a loan, so they could not be treated as a loan.

[2] [¶ 16] The district court's decision, however, misapplies the clear provisions of the Revised Uniform Partnership Act. RUPA operates automatically if a partnership agreement does not have contrary provisions; it is not necessary for an agreement to adopt the statutory partnership provisions. In this sense, RUPA operates like the Uniform Probate Code, which fills in the blanks of an estate plan for those who die intestate or with a will that does not address a contingency that has occurred.

[¶ 17] The district court's calculations in this case treat the mortgage payments as

neither capital contributions nor advances, but as something else not contemplated by RUPA. The partnership agreement at paragraph ten and RUPA at § 17–21–401(k) are consistent in requiring that the partners must unanimously consent to any amendments of the partnership agreement. Advances are not addressed in the agreement, so we must turn to RUPA's default provisions in that regard. *B & R Builders*, 915 P.2d at 1199. Nothing in RUPA requires advances to the partnership or payment of partnership debts by partners to be memorialized in writing as a loan. In fact, the act addresses payments and advances in several places without requiring a writing or unanimous partner approval:

- § 17–21–401(c) requires the partnership to reimburse a partner for payments made by the partner in the ordinary and proper conduct of the business of the partnership or for the preservation of its business or property;
- § 17–21–401(d) requires the partnership to reimburse a partner for a payment or advance to the partnership beyond the amount of capital the partner agreed to contribute;
- § 17–21–401(e) provides that a partner's cash payment on behalf of the partnership automatically constitutes a loan which accrues interest from the date of the payment;

Read in pari materia, these provisions of the act evidence a presumption that additional amounts paid by a partner, over and above the capital contributions recited in the partnership agreement or agreed to, are presumed to be loans to the partnership, with interest payable from the date of the advance. RUPA is unequivocal on this point. The drafters' comment to § 401(d) states: "Subsection (d) is based on UPA Section 18(c). It makes explicit that the partnership must reimburse a partner for an advance of funds beyond the amount of the partner's agreed capital contribution, thereby treating the advance as a loan." Uniform Partnership Act § 401, cmt. 5, 6 U.L.A. 135 (1997).

[¶ 18] Warnick Ranches partnership was formed "for the purpose of managing and operating a farming and ranching business"

on property that was subject to a mortgage at the time the partnership was formed. It was entirely foreseeable that additional cash would be needed to meet the mortgage payments, as in fact happened. The California Court of Appeals ruled recently that partners have no duty to make capital contributions beyond the partnership agreement, even to prevent foreclosure of the partnership property. *Jones v. Wagner,* 90 Cal.App.4th 466, 108 Cal.Rptr.2d 669, 674 (4 Dist.2001). The silence of the partnership agreement on this point, combined with the statutory presumption in favor of advances over capital contributions, leads necessarily to the conclusion that a partner's payment of the Warnick Ranch mortgage, without the unanimous consent required for additional capital contributions, would be an advance and a loan to the partnership.

[¶ 19] In his brief, Randall Warnick argues a policy reason for the opposite position, *i.e.,* that treating an advance as a loan would allow a partner to unilaterally dilute the other partners' shares. That argument is one for the legislature, which could not have stated more clearly that a partner's capital share is measurable only after all partnership's liabilities, including those arising from partner advances, are satisfied.

[¶ 20] We turn then to the consequences of this dispute. RUPA, with the goal of avoiding unnecessary dissolutions of partnerships, contains a significant change from prior partnership law. Again in the words of the drafters:

RUPA dramatically changes the law governing partnership breakups and dissolution. An entirely new concept, "dissociation," is used in lieu of the UPA term "dissolution" to denote the change in the relationship caused by a partner's ceasing to be associated in the carrying on of the business . . . .

Under RUPA, unlike the UPA, the dissociation of a partner does not necessarily cause a dissolution and winding up of the business of the partnership. Section 801 identifies the situations in which the dissociation of a partner causes a winding up of the business. Section 701 provides that in all other situations there is a buyout of the

partner's interest in the partnership, rather than a windup of the partnership business. In those other situations, the partnership entity continues, unaffected by the partner's dissociation.

Uniform Partnership Act § 601, cmt. 1, 6 U.L.A. 164 (1997).

[¶ 21] The Warnick Ranch Partnership Agreement is again silent as to dissociation, addressing only liquidation. RUPA states that a partner has the power to dissociate at any time by express will, § 17–21–602(a), and that:

(a) A partner is dissociated from a partnership upon:

(i) Receipt by the partnership of notice of the partner's express will to withdraw as a partner or upon any later date specified in the notice;

\* \* \* \*

(v) On application by the partnership or another partner, the partner's expulsion by judicial decree because:

\* \* \* \*

(C) The partner engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with that partner.

§ 17–21–601.

[¶ 22] The District Court, without specifying any of the above reasons, concluded that "[d]issociation of Plaintiff from the Partnership is the appropriate remedy at this time." We cannot disagree. The partners held discussions in 1983 and again in 1998 regarding the possibility of Randall's selling his partnership interest to his parents or to his brother. The 1998 discussion devolved into a heated dispute, and eventually this litigation, between Randall and his parents about Randall's percentage of ownership. The record even includes allegations of physical disputes between Randall and his father, and of Randall Warnick's paying personal expenses out of the partnership checking account. Randall conceded in his deposition that reconciliation among the partners was not a realistic possibility.

[¶ 23] Under these circumstances, the record supports the district court's conclusion that there was no genuine issue as to the material fact that a dissociation occurred. Considering the April 1999 letter from Randall's attorney to the partnership, in the context of deposition testimony regarding allegations of physical violence and misappropriation of partnership funds, we determine that the date of the letter is the date of dissociation.

[¶ 24] However, the court erred in its calculation of the judgment. RUPA states that a dissociated partner's interest in the partnership shall be purchased by the partnership for a buyout price. §§ 17–21–603(a), 701(a), (b). The buyout price is equal to the amount that would have been distributable to the dissociating partner under § 17–21–808(b) if, on the date of the dissociation, the partnership's assets had been sold. § 17–21–701(b). However, § 808(a) provides that partnership assets must first be applied to discharge partnership liabilities to creditors, including partners who are creditors. As noted above, as each partner advanced funds to pay the mortgage or other partnership expenses, that partner became a creditor of the partnership for the amount advanced, and is entitled to interest on each amount from the date of the advance. In calculating Randall's buyout price, it is therefore necessary to first calculate the amount that the partnership owes to each partner for advances to the partnership, with interest accrued from the date of each advance at the rate specified in § 17–21–104(b).

[¶ 25] Next, there is the matter of two $12,000 draws, or "guaranteed payments," that Wilbur Warnick was entitled to in 1998 and 1999, but actually left in the partnership account and did not receive. The guaranteed payment arrangement was at Randall's request and agreed among the partners in order to provide Randall an income and to avoid the partnership showing a taxable profit. Randall received his draw as agreed in 1998 and 1999 but Wilbur did not, even though he reported it as personal income and paid taxes on it. At the time he became entitled to the "guaranteed payment," the $12,000 was Wilbur's personal money and his leaving it with the partnership

was the functional equivalent of another advance to the partnership. § 17–21–401(d); see, *Hamilton Airport Advertising, Inc. v. Hamilton*, 462 N.E.2d 228, 238 (Ind.App. 4 Dist.1984). Upon remand, therefore, in calculating the buyout price for Randall Warnick's share, it is necessary to first calculate the amount the partnership owes Wilbur Warnick for the two $12,000 draws he left with the partnership, with interest from the date he was entitled to the payments.

[¶ 26] Finally, we agree with the district court's denial of Randall Warnick's other claims for relief. As discussed above, a partnership disagreement is controlled by the terms of the partnership agreement. To the extent the agreement is silent, RUPA provides the default provisions. Just as the parol evidence rule operates to prevent extrinsic evidence from being used to contradict, subtract from, add to, or vary the terms of an unambiguous contract, *Collins v. Finnell*, 2001 WY 74, ¶ 10, 29 P.3d 93, ¶ 10 (Wyo.2001), it also operates to prevent extrinsic evidence from being used to avoid RUPA's default provisions when the agreement is silent or ambiguous. Randall Warnick on his cross appeal complains that the court improperly fashioned an equitable remedy. RUPA itself preserves equitable considerations, § 17–21–104(a), and we are in any event directing that the dissociation buyout remedy is to be calculated in accord with statutory standards.

## CONCLUSION

[¶ 27] A partnership agreement governs relations among general partners and between partners and their partnership. To the extent the agreement is silent or ambiguous, the Revised Uniform Partnership Act provisions apply. Review of the entire record leads us to conclude that there is no genuine issue regarding the fact that a partner dissociation occurred, and that the Plaintiff is entitled to a judgment as a matter of law for the buyout price of his interest. However, the district court's calculation of the dissociated partner's buyout price is reversed and the case remanded for a calculation of that price after repayment of partner advances as loans, in accord with the statute and this decision.