2006 WY 58

**Wilbur K. WARNICK; Dee J. Warnick; and Warnick Ranches, Appellants (Defendants),**

v.

**Randall M. WARNICK, Appellee (Plaintiff).**

**No. 04–244.**

Supreme Court of Wyoming.

May 12, 2006.

Representing Appellants: Dennis M. Kirven, of Kirven & Kirven, P.C., Buffalo, Wyoming.

Representing Appellee: Charles E. Graves, of Graves, Miller & Kingston, P.C., Sheridan, Wyoming; Timothy C. Kingston, of Graves, Miller & Kingston, P.C., Cheyenne, Wyoming.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

BURKE, Justice.

[¶ 1]  Wilbur K. Warnick, Dee J. Warnick and Warnick Ranches (collectively, Warnick Ranches) appeal the district court's determination of the amount owed to a withdrawing partner. Warnick Ranches claims the district court should have considered evidence of costs of a hypothetical asset sale to reduce the buyout price. We affirm.

## ISSUE

[¶ 2]  Warnick Ranches states its issue on appeal as:

Did the District Court abuse its discretion in excluding evidence offered by [Warnick Ranches] regarding the costs of liquidating partnership assets in determining the buyout price of a dissociated partner under W.S. § 17–21–701(b)?

## FACTS

[¶ 3]  We have previously had occasion to review this matter, issuing our opinion in *Warnick v. Warnick*, 2003 WY 113, 76 P.3d 316 (Wyo.2003) (*Warnick I*). That decision sets forth the underlying facts, which we will not restate here. Generally, this case involves the dissociation of Randall Warnick as a partner of Warnick Ranches as of April 14,

1999, and the amount he should receive for his interest in the partnership.

[¶ 4] In *Warnick I*, we affirmed the district court's determination that Randall Warnick was entitled to a remedy as a dissociated partner. *Id.*, ¶ 22. Because the partnership agreement did not specify how the partnership would be valued or how to calculate a partner's interest upon withdrawal, the district court determined the value of Randall Warnick's interest and entered judgment in his favor. *Id.*, ¶ 21. We concluded that the amount of the judgment was incorrect because the district court had not properly calculated the buyout price. The source of error was the district court's failure to take into consideration advances made by each partner to the partnership. *Id.*, ¶¶ 24–25. We remanded the matter to the district court to recalculate the amount to be paid to Randall Warnick as a dissociated partner. *Id.*, ¶ 27.

[¶ 5] Upon remand, with the issue of liabilities largely resolved by *Warnick I,* the focus turned to another aspect of valuing Randall Warnick's share in the partnership. For the first time, Warnick Ranches asserted that for purposes of calculating the buyout price, the value of ranch assets should be less than the amount reflected in its appraisal. Specifically, it requested that the district court deduct $50,000 from the appraised value of the ranch assets for real estate commissions and expenses of sale, including those associated with selling livestock and equipment. Randall Warnick objected to a reduced value, claiming the deduction amounted to unsupported speculation.

[¶ 6] On July 21, 2004, the district court held an evidentiary hearing on the matter. At the hearing, the district court denied evidence proffered by Warnick Ranches regarding expenses of a hypothetical sale of partnership assets. On August 12, 2004, the district court issued its decision letter in which it noted that it had previously ruled that "possible costs of sale are not an offset regarding asset value."

[¶ 7] Thereafter, the district court entered its final order determining the amount to be paid to Randall Warnick. The amount was calculated by first valuing the partnership assets and deducting advances made to the partnership by each partner to arrive at a net value of the partnership of $133,901.68. Randall Warnick's percentage of ownership (34%) was then applied to the net value, to arrive at his proportionate share of the partnership of $45,526.57. Adding this amount to the amount of Randall Warnick's loan to the partnership, $70,256.56, the district court determined a buyout price of $115,783.13.[1] In its order, the district court also found "[t]hat any possible costs of sale associated with selling the assets of the partnership as an offset to the estimated value of the assets is too speculative and inadmissible." Warnick Ranches appealed.

### STANDARD OF REVIEW

[¶ 8] Evidentiary rulings are left to the sound discretion of the trial court and will not be overturned where the record reveals a legitimate basis for the ruling. *Armstrong v. Hrabal,* 2004 WY 39, ¶ 10, 87 P.3d 1226, 1230 (Wyo.2004). Resolution of this case also involves the application of Wyo. Stat. Ann. § 17–21–701(b) (LexisNexis 2003). Our principles of statutory interpretation are well established:

> In interpreting statutes, our primary consideration is to determine the legislature's intent. . . . [I]n ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony. Statutory construction is a question of law, so our standard of review is de novo. We endeavor to interpret statutes in accordance with the legislature's intent. We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection. We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute *in*

---

1. The actual amount awarded to Randall Warnick was $95,767.99, which included interest on the buyout amount from April 14, 1999, minus an amount of $62,049.00 which had been previously deposited with the district court.

*pari materia.* When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction. *BP America Production Co. v. Dept. of Rev.*, 2005 WY 60, ¶ 15, 112 P.3d 596, 604 (Wyo. 2005). The statute at issue is part of the Wyoming Revised Uniform Partnership Act (RUPA), Wyo. Stat. Ann. §§ 17–21–101 *et seq.* (LexisNexis 2003).[2] RUPA directs that we construe and apply its provisions to "effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it." Wyo. Stat. Ann. § 17–21–1001 (LexisNexis 2003).

## DISCUSSION

[¶ 9] In calculating the buyout price for Randall Warnick's interest in the partnership, the district court valued the partnership assets without making any deduction for expenses that Warnick Ranches argued would be incurred if those assets were sold. On appeal, Warnick Ranches claims that the district court should have allowed expert testimony concerning costs associated with the sale of ranch assets and challenges the district court's ruling that costs of sale were too speculative.

### Calculation of the buyout price

■ [¶ 10] The district court was charged with calculating the amount owed to Randall Warnick pursuant to the applicable provisions of RUPA, Wyo. Stat. Ann. § 17–21–603(a) (LexisNexis 2003) and Wyo. Stat. Ann. § 17–21–701. *Warnick I*, ¶ 24. That amount, or the buyout price, is the amount that would have been paid to the dissociating partner following a settlement of partnership accounts upon the winding up of the partnership, if, on the date of dissociation, the as-

sets of the partnership were sold at a price equal to the greater of the liquidation value or the value based on a sale of the business as a going concern without the dissociating partner. Wyo. Stat. Ann. § 17–21–701(b) and § 17–21–808(b) (LexisNexis 2003); 59A Am.Jur.2d *Partnership* § 538 (2003). "[P]artnership assets must first be applied to discharge partnership liabilities to creditors, including partners who are creditors." *Warnick I*, ¶ 24; Wyo. Stat. Ann. § 17–21–808(b). The interplay between RUPA § 701(b) and § 808(b) requires that obligations to known creditors must be deducted before a partner distribution can be determined. "[T]hus, the buyout price is the net of all known liabilities." John W. Larson, *Florida's New Partnership Law: The Revised Uniform Partnership Act and Limited Liability Partnerships*, 23 Fla. St. U.L.Rev. 201, 234 (1995). Stated another way, "[i]n computing the buyout price, the amount the dissociating partner receives is reduced by his or her share of partnership liabilities." Donald J. Weidner and John W. Larson, *The Revised Uniform Partnership Act: The Reporters' Overview*, 49 Bus. Law. 1, 12 (1993).

■ [¶ 11] The purpose of the remand was for the district court to consider liabilities—partner advances, which had previously been omitted from its calculation. *Warnick I*, ¶ 24. Warnick Ranches makes no argument that costs associated with a hypothetical sale of ranch assets should be considered a partnership liability. Its argument focuses solely upon the valuation of the partnership's assets under Wyo. Stat. Ann. § 17–21–701(b). Accordingly, our review is similarly limited, and we need not consider costs of sale as a liability, affecting the amount that would have been "distributable" to Randall Warnick under Wyo. Stat. Ann. § 17–21–808(b)[3] or the settlement of partnership accounts.

---

2. The Wyoming legislature adopted RUPA in 1994 as a replacement for the Uniform Partnership Act.1993 Wyo. Sess. Laws ch. 194. *Warnick I*, ¶ 12.

3. Wyo. Stat. Ann. § 17–21–808 discusses the settlement of partner accounts, and subsection (b) states:

Each partner is entitled to a settlement of all partnership accounts upon winding up the

partnership business. In settling accounts among the partners, the profits and losses that result from the liquidation of the partnership assets shall be credited and charged to the partners' accounts. The partnership shall make a distribution to a partner in an amount equal to that partner's positive balance. A partner shall contribute to the partnership an amount equal to that partner's negative balance only to the extent that negative balance is

[¶ 12]   At this juncture, Warnick Ranches claims that the district court erred in the first step of its calculation of the buyout price by overvaluing the ranch assets.   The asserted error is the district court's failure to deduct estimated sales expenses of $50,000 from the value of the partnership assets.   As the basis for its argument, Warnick Ranches states that the appraiser was prepared to testify about the "liquidation value" of the ranch assets.   A common understanding of liquidation is "[t]he act or process of converting assets into cash."   Black's Law Dictionary 950 (8th ed.2004).   Warnick Ranches appears to assume that the liquidation value of the ranch is the amount of cash that would remain following a sale.   This assumption is not supported by the pertinent statutory language and the circumstances of this case.

[¶ 13] · Critical to our determination in this case is the recognition that the assets of this partnership were not, in fact, liquidated.   Instead, the record reflects that the assets were retained by Warnick Ranches. Randall Warnick's dissociation from the partnership did not require the winding up of the partnership.   *Warnick I*, ¶ 20.   We acknowledge that when a business is not actually dissolving, "valuation may be difficult and will have to be based to some extent on estimates and appraisals."   *Lieberman v. Wyoming.com LLC*, 2004 WY 1, ¶ 27, 82 P.3d 274, 284 (Wyo.2004) (Lehman, J., dissenting, with whom Kite, J., joins).   However, the district court held its hearing several years after the date of valuation, and there was no question that the partnership's ranching operations had continued following Randall Warnick's departure.   There was no evidence of any actual, intended, or pending sale be-

fore the district court at the time of dissociation, and, therefore, asset liquidation was only hypothetical.   Accordingly, the deduction urged by Warnick Ranches is for *hypothetical* costs. *See Taffi v. United States (In re Taffi),* 68 F.3d 306, 309 (9th Cir.1995) (costs of sale are hypothetical where the property is not actually being sold).   As we will explain, because of the hypothetical nature of the urged $50,000 deduction, we find that the district court's calculation was not erroneous.

[¶ 14]   If, in applying Wyo. Stat. Ann. § 17–21–701(b), we were to interpret the term "liquidation value" in isolation, we might envision an amount representing the net proceeds resulting from a distress sale.[4] However, that interpretation is precluded by the language contained in the statute.   The full text of Wyo. Stat. Ann. § 17–21–701(b) provides:

> The buyout price of a dissociated partner's interest is the amount that would have been distributable to the dissociating partner under W.S. 17–21–808(b) if, on the date of dissociation, the assets of the partnership were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern without the dissociated partner and the partnership were wound up as of that date.   In either case, the sale price of the partnership assets shall be determined on the basis of the amount that would be paid by a willing buyer to a willing seller, neither being under any compulsion to buy or sell, and with knowledge of all relevant facts.   Interest shall be paid from the date of dissociation to the date of payment.[5]

---

attributable to an obligation for which that partner is personally liable under W.S. 17–21–306.

4.  Liquidation value can be defined as "1. The value of a business or of an asset when it is sold in liquidation, as opposed to being sold in the ordinary course of business. 2. See *liquidation price* ....'' Black's Law Dictionary 1587 (8th ed.2004).   Liquidation price is "[a] price that is paid for property sold to liquidate a debt.   Liquidation price is [usually] below market price [fair market value]." *Id.* at 1227.

5.  Wyo. Stat. Ann. § 17–21–701(b) differs somewhat from the Uniform Laws version of the same provision, which does not include the second to last sentence:

> The buyout price of a dissociated partner's interest is the amount that would have been distributable to the dissociating partner under Section 807(b) if, on the date of dissociation, the assets of the partnership were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern without the dissociated partner and the partnership were

In analyzing this provision, we must consider all of the language contained therein:

> We are guided by the full text of the statute, paying attention to its internal structure and the functional relation between the parts and the whole. Each word of a statute is to be afforded meaning, with none rendered superfluous. Further, the meaning afforded to a word should be that word's standard popular meaning unless another meaning is clearly intended. If the meaning of a word is unclear, it should be afforded the meaning that best accomplishes the statute's purpose.

*Rodriguez v. Casey,* 2002 WY 111, ¶ 10, 50 P.3d 323, 326–27 (Wyo.2002) (internal citations omitted). When read as a whole and in a manner consistent with its purpose, we find the statute does not support Warnick Ranches' proposed meaning of liquidation value.

[¶ 15] ·Liquidation value is one of two identified methods for valuing the partnership assets. Application of the two methods to the same partnership may yield two distinct values. The Massachusetts Supreme Court compared the two methods, noting:

> The method of valuation of a partnership interest in a going concern necessarily differs from the valuation of the same interest at the point of liquidation. The liquidation value looks to the value of the partnership's assets less its liabilities and determines each partner's appropriate share. When valuing a going concern, however, the market value of the partnership interest itself is what is at stake, rather than the percentage of net assets it represents. Depending on circumstances, the market value of the partnership interest may be more or less than the value of the same percentage of net assets.

*Anastos v. Sable,* 443 Mass. 146, 819 N.E.2d 587, 590–91 (2004). By providing two approaches, Wyo. Stat. Ann. § 17–21–701(b) contemplates variations that could result from differing appraisal techniques and varying business circumstances.[6]

■■■ [¶ 16] Significantly, the buyout price under Wyo. Stat. Ann. § 17–21–701(b) involves use of the *greater* value resulting from the alternate valuation methods. Warnick Ranches' argument seems to assume that the district court's calculation incorporated the liquidation value of the partnership assets. ·We see room for disagreement based upon the record.[7] The district court did not specify which valuation method was selected, and it was therefore possible that the value used in the buyout price calculation represented the going concern value of the ranch.[8]

---

wound up as of that date. Interest must be paid from the date of dissociation to the date of payment.
Uniform Partnership Act § 701, 6 U.L.A. 175 (1997).

**6.** The rationale of the drafters in providing these alternative methods of valuation has been explained:

First, it cuts through some of the confusion in the cases concerning the term *going concern value.* To many, *going concern value* is a term used to explain that assets that are a part of a going concern have greater value than the sum of the values of individual assets. On the other hand, recent partnership cases in the estate tax context state that going concern value is lower than liquidation value if the assets cannot be liquidated because they are committed to a going concern. In effect, dedication to a going concern is considered an encumbrance. [RUPA] [s]ection 701 is intended to indicate that, however value is perceived, the higher of the two values is to be used. Second, valuation of the going concern "without the dissoci-

ating partner" is intended to emphasize that the partner being bought out need not be paid for his or her human capital.
Donald J. Weidner and John W. Larson, *The Revised Uniform Partnership Act: The Reporters' Overview,* 49 Bus. Law. 1, 12 (1993) (emphasis in original) (footnotes omitted).

**7.** It does not appear that either party presented evidence specifically addressing the going concern value of the ranch. It seems that the parties agreed, or acquiesced, to the value established by the appraisal as representing the sale price of the ranch without specifying a particular valuation method.

**8.** Although the language of Wyo. Stat. Ann. § 17–21–701(b) does not indicate that one method is more likely to yield a higher value over the other, courts tend to view going concern value as more favorable to the departing business member. The RUPA provisions allowing the district court to determine the buyout price are modeled after dissenters' rights remedies in corporate statutes. Donald J. Weidner and John W. Larson, *The Revised Uniform Partnership Act: The Reporters'*

Warnick Ranches makes no argument that costs of sale should also be deducted from the going concern value because, under its rationale, the $50,000 deduction is required only as part and parcel of liquidation value. Were we to conclude that the district court used a figure which represented the going concern value, our analysis could end here without further discussion of hypothetical costs of sale.

[¶ 17] However, even if the district court valued the partnership assets using liquidation value, the deduction for costs associated with a hypothetical sale would not be warranted. Contrary to the interpretation asserted by Warnick Ranches, liquidation value is not the amount of the seller's residual cash following a sale. We find that the meaning of liquidation value in the statute is best understood by comparing it to the other method provided. When contrasted with "going concern value" it is clear that "liquidation value" simply means the sale of the separate assets rather than the value of the business as a whole.

[¶ 18] Additionally, under either valuation method, Wyo. Stat. Ann. § 17–21–701(b) directs that the sale price be determined "on the basis of the amount that would be paid by a willing buyer to a willing seller, neither being under any compulsion to buy or sell,

and with knowledge of all relevant facts." The legislature chose to supplement the Uniform Laws version of this provision by adding this sentence, lending added significance to this language.[9] This "willing buyer" and "willing seller" language does not present a novel legal concept, as it sets forth precisely what has long been the legal definition or test of "fair market value." Black's Law Dictionary 1587 (8th ed.2004). "Fair market value is generally defined as the amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." *Lieberman*, ¶ 28 n. 1 (citing Black's Law Dictionary 597 (6th ed.1990) and Wyo. Stat. Ann § 39–11–101(a)(vi) (LexisNexis 2001) (defining fair market value as used for taxation purposes)).

[¶ 19] Warnick Ranches does not provide any analysis concerning the fair market value language contained in Wyo. Stat. Ann. § 17–21–701(b) and does not explain how it can be reconciled with its urged meaning of liquidation value as involving a deduction for costs of sale. That reconciliation may be difficult.[10] Simply stated, a deduction from fair market value yields an amount which is, by definition, less than fair market value. Warnick Ranches cites no authority support-

*Overview*, 49 Bus. Law. 1, 13 (1993). Dissenting shareholders are generally entitled to a valuation of their shares under a going concern valuation method, rather than a liquidation method, unless the corporation is undergoing an actual liquidation. *Hansen v. 75 Ranch Co.*, 288 Mont. 310, 957 P.2d 32, 42–43 (1998) (collecting cases). By using the going concern value, issues concerning deductions for transactional costs are often avoided because if those costs would be incurred subsequent to the dissenter's objection, then those costs should not be assessed against the dissenting shareholder. *Id.* at 43. Under the former version of the Uniform Partnership Act, use of the going concern method of valuation has been held to be correct as a matter of law when the remaining partners choose to continue the business. *Anastos*, 819 N.E.2d at 592 (whether liquidation value or going concern value should be used presented issue of first impression). With this understanding in mind, Warnick Ranches' assumption that liquidation value was used by the district court seems less likely.

9. This language is similar to that found in commentary to RUPA, § 701(b), which provides, in part:

Liquidation value is not intended to mean distress sale value. Under general principles of valuation, **the hypothetical selling price in either case should be the price that a willing and informed buyer would pay a willing and informed seller, with neither being under any compulsion to deal.**
Uniform Partnership Act § 701, 6 U.L.A. 177 (1997) (emphasis added).

10. As one court noted:
... [L]ogic dictates that the "fair market value" of an item generally includes a component for costs of sale. When the willing, but not obligated, seller determines what price he will accept for a certain item of property, he takes into account those costs that he will incur in making the sale. These costs drive the seller's bottom line; i.e., the price below which he will not go. Therefore, the costs of sale have already been factored into the market value of the property when it is placed for sale. To allow a blanket deduction for costs of sale gives a windfall to the seller who has already accounted for them in his sales price.
*Property v. Tokai Financial Services*, 767 So.2d 494, 499 (Fla.Dist.Ct.App.2000).

ing its proposed deduction of hypothetical sales expenses and does not contend that the deduction is necessary to arrive at fair market value. Regardless, we have expressed disapproval of such a deduction, stating: "[h]ypothetical costs have no relationship to an arms-length sale price which is the value to be established by recognized appraisal techniques when no sale occurs." *Appeal of Monolith Portland Midwest Co., Inc.*, 574 P.2d 757, 761 (Wyo.1978).[11]

[¶ 20] Considering the language of RUPA § 701(b) as a whole, we conclude that "liquidation value" does not have the meaning that Warnick Ranches desires, i.e. the amount a seller would "net" upon liquidation. Rather, "liquidation value" represents the sale price of the assets based upon fair market value. "It is one thing to say that a business is worth little more than its hard assets. It is quite another ... to deduct the substantial cost of a liquidation which all parties agree will not take place." *Chatterton v. Business Valuation Research*, 90 Wash.App. 150, 951 P.2d 353, 357 (1998). Where it is contemplated that a business will continue, it is not appropriate to assume "an immediate liquidation with its attendant transactional costs and taxes." *Id.* We therefore hold that, under Wyo. Stat. Ann. § 17–21–701(b), purely hypothetical costs of sale are not a required deduction in valuing partnership assets.[12] We find no error in the district court rejecting the $50,000 deduction urged by Warnick Ranches in calculating the buyout price.

### Evidentiary ruling

[¶ 21] Having clarified that the district court was not required to consider the costs of a hypothetical sale, we turn to the remainder of Warnick Ranches' argument that asserts the district court abused its discretion by refusing testimony from a qualified expert witness. Warnick Ranches claims that it makes no sense that the expert would be allowed to testify about some mat-

ters and not others, and that the inherent inconsistency of the district court's evidentiary ruling demonstrates an abuse of discretion. We disagree.

[¶ 22] The expert was a certified and experienced appraiser, who prepared a detailed report about his appraisal methodology and conclusions concerning ranch assets. The appraisal report states that the appraised value represents the "market value" of the subject property, meaning the "most probable price that a property is to bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably assuming the price is not affected by undue stimulus." The appraisal report does not specify an amount for costs associated with a sale and provides no indication that the stated market value figure needed further adjustment.

[¶ 23] We can find no abuse of discretion in the district court's decision to exclude testimony from Warnick Ranches' expert concerning hypothetical costs of sale. The district court determined "[t]hat any possible costs of sale associated with selling the assets of the partnership as an offset to the estimated value of the assets is too speculative and inadmissible." Again, the hearing on valuation took place several years after the April 14, 1999, valuation date. The district court's ruling was made in light of the fact that the partnership had continued after Randall Warnick's dissociation and no sale had taken place. Under these circumstances, hypothetical costs are speculative. More importantly, the proffered testimony was not pertinent to the district court's task of calculating the buyout price of Randall Warnick's partnership interest.

[¶ 24] Affirmed.

---

11. *See also Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 552 (Del.2000) (lower court properly denied any deduction from corporation's net asset value for speculative expenses relating to future sales that were not contemplated at valuation date); *Shaw v. Charter Bank*, 576 So.2d 907, 908 (Fla.Dist.Ct.App.1991) (rejecting costs of disposition, including real estate sales commission,

five percent sales costs, and additional carrying costs as deductions to fair market value).

12. Partners may provide in their agreement for different treatment of hypothetical costs of sale. RUPA only supplies the default rules in the absence of an agreement. *Warnick I,* ¶ 12; Wyo. Stat. Ann. § 17–21–103 (LexisNexis 2005).