[No. B213618. Second Dist., Div. Three. July 28, 2011.]

JERRY RAPPAPORT, Plaintiff and Respondent, v.
MARVIN GELFAND et al., Defendants and Appellants.

COUNSEL

Gelfand & Glaser, Marvin Gelfand, Steven H. Glaser; Rosen Saba and James Rosen for Defendants and Appellants.

Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg, Mark T. Drooks, Thomas R. Freeman and Michelle C. Tam for Plaintiff and Respondent.

OPINION

**CROSKEY, J.**—Defendants and appellants Marvin Gelfand (Gelfand), Steven Glaser (Glaser), Gelfand Rappaport & Glaser LLP (GRG) and

Gelfand & Glaser LLP (GG), the successor to GRG, appeal a judgment in favor of plaintiff and respondent Jerry Rappaport (Rappaport) following a bench trial to determine the "buyout price" of a dissociating partner's interest in a law firm pursuant to Corporations Code section 16701, subd. (b).[1] That section is part of the Uniform Partnership Act of 1994 (UPA) (§ 16100 et seq.), which applies to law partnerships.

In this apparent case of first impression in California, we are called upon to construe section 16701, subdivision (b), which provides, "The buyout price of a dissociated partner's interest is the amount that would have been distributable to the dissociating partner under subdivision (b) of Section 16807 if, on the date of dissociation, the assets of the partnership were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern without the dissociated partner and the partnership was wound up as of that date. Interest shall be paid from the date of dissociation to the date of payment."

Here, the trial court ruled that "[b]ecause of the peculiar relationship between dissociation and the wind-up process when applied in the law firm context, a construct is created to calculate a value as of October 31, 2005, based upon individual assets being liquidated over time, and then bringing the value 'back' to the date of dissociation." The trial court's interpretation of section 16701 is correct and its creating a "construct" based on individual assets being liquidated over time is a reasonable application of the statute. It awarded judgment in favor of Rappaport and against all of the appellants, based on 31 percent of the liquidation value of the partnership as determined by expert testimony. (See fn. 5, *post.*)

The trial court further found that appellants Gelfand and Glaser were individually liable, in addition to the limited liability partnerships of GRG and GG,[2] for the amount of the buyout payment to Rappaport. Although we affirm the trial court's interpretation and application of section 16701, subdivision (b), we reverse the trial court's finding of individual liability on the part of Gelfand and Glaser.

In addition, our review of the record indicates that the trial court made a relatively minor mathematical error which we will correct by modifying the judgment.

---

[1] All further statutory references are to the Corporations Code, unless otherwise specified.

[2] Both GG and GRG are identified as registered limited liability partnerships in the record and their status as such is undisputed by the parties.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

### 1. The Partnership and Rappaport's Dissociation Therefrom

The instant action arises from the dissociation of Rappaport from the law firm of GRG. Gelfand and Glaser were the original partners of the firm and had been so since 1986. In 2000, Rappaport joined Gelfand and Glaser to form GRG. Gelfand held a 46 percent share in the practice; Rappaport's share was 31 percent; and Glaser had the remaining 23 percent share. There was no oral or written partnership agreement governing the terms of any partner's dissociation.

In 2005, Rappaport indicated he wished to dissociate from the GRG limited liability partnership. Gelfand and Glaser wished to continue their partnership and did so for approximately 14 months thereafter. The three partners agreed the effective date of dissociation would be October 31, 2005. From October of 2005 through February of 2006, the parties attempted to negotiate the terms of Rappaport's dissociation. On February 22, 2006, after negotiations broke down, Rappaport made a written demand for compensation for his partnership interest in accordance with section 16701, which "controls and provides that I am to receive the greater of the liquidation or going concern value."

### 2. Proceedings

On December 21, 2006, Rappaport filed suit against Gelfand, Glaser, GRG and GG (collectively, appellants), seeking, inter alia, damages for breach of section 16701, subdivision (b). GG, the successor to GRG, filed a cross-complaint against Rappaport for money had and received and for conversion. On February 20, 2008, the matter came on for trial.

The three major assets of GRG in issue during the trial were (1) general accounts receivable; (2) possible recovery of a contingency fee in a case identified as *Hughes v. U.S. Foodservice* (Hughes litigation); and (3) receivables due from work in four separate litigation matters on behalf of a client, Dr. Morry Waksberg (Waksberg litigation). Also in dispute was the amount of liability that should be attributed to Rappaport under the office space lease.

At trial, Rappaport presented expert testimony by Jan Goren (Goren), a certified public accountant, and Paul Kelley (Kelley), a civil litigator who was specifically retained to value the Hughes litigation and Waksberg litigation receivables. GRG presented expert testimony by David Nolte (Nolte) of Fulcrum Financial Inquiry.

---

[3] The factual and procedural background is drawn in substantial part from the trial court's extensive statement of decision.

### 3. *Trial Court's Ruling*

The trial court issued an extensive statement of decision which set forth the valuation methodology that it adopted and applied to the various assets and liabilities in issue. It began its analysis as follows: "[Section 16701] permits an individual to 'dissociate' from the partnership while permitting the remaining partners the option of buying out the departing partner as of a given date, while continuing the partnership. . . . Essentially, neither the departing partner nor the remaining partners should obtain an advantage by the dissociation. The basic policy judgment is that *the departing partner should get the same amount through the buyout that he or she would get if the business were wound up*." (Italics added.)

"While the statute sets forth two alternatives for valuing the dissociating partner's interest, there remains some question whether the concept of sale as of the entire business is theoretically possible when applied to a law practice. . . . [¶] As applied to the instant case, the parties agree upon which assets must be valued to determine Rappaport's share as of October 31, 2005. The disagreement lies in the method of valuation."

The trial court reasoned, "Because of the peculiar relationship between dissociation and the wind-up process when applied in the law firm context, a construct is created to calculate a value as of October 31, 2005, based upon individual assets being liquidated over time, and then bringing the value 'back' to the date of dissociation." The trial court was persuaded by the testimony of Rappaport's expert, Goren, who opined "that in assessing value, one would calculate an amount on October 31[, 2005,] based upon individual assets being liquidated over time, calculating risk, and then bringing the value 'back' to the date of dissociation. Whether looking at sale of the business as [a] whole, or by liquidation of assets, Goren assumed all partners were attempting to maximize the value of the assets. He did not view 'liquidation' as assuming the sale of all assets on one date."

With respect to the three major assets of GRG and the lease liability, the trial court ruled as follows:

### a. *General Accounts Receivable*

On the date of Rappaport's dissociation, GRG, like most law firms, had a number of accounts receivable. Nolte, for the defense, valued the general accounts receivable at 25 percent of face value for accounts under 90 days, and of no value thereafter, for a total valuation of $60,800. Nolte reasoned as follows: "Due to the nature of most 'service' businesses, a strict liquidation assumption provides a serious discount when compared to the face amount of

a receivable. Service receivables are not the result of a transfer of acceptable physical goods, but are instead subject to after-the-fact claims that the billed services were not desired, of poor quality, etc. In this situation there is almost no market for the non-recourse sale of 'service' receivables, especially where the service provide[r] is not providing ongoing work that the debtor needs. As a result, the receivables of a 'service' business have almost no value under the treatment prescribed by law in the case of a withdrawing partner."

Goren, in turn, valued 0–90 day receivables at 90 percent of face value, 90–180 day receivables at 55 percent of face value, and agreed that receivables had no value if they exceeded 180 days, for a total valuation of $256,842. Goren noted the assessment of accounts receivable was particularly difficult in the context of a statutory dissociation "because in a partnership windup, there is an orderly process over time, where under [section] 16701, one must make an assumption as to an orderly process, yet value the asset at a particular point in time." Goren based his valuation of the receivables upon GRG's 85 percent collection rate for the year 2005 to date.

The trial court fully credited Goren's testimony in this regard and found Rappaport had "met his burden as to the accounts receivable analysis."

### b. *The Contingency Fee in the Hughes Litigation*

In July of 2002, Rappaport was retained on a contingency fee basis to represent Craig Hughes, a former employee of U.S. Foodservice, in an employment discrimination action (Gov. Code, § 12940 et seq.) filed in federal court. The district court entered judgment in Hughes's favor following a bench trial and awarded him damages, statutory attorney fees consisting of a lodestar ($400,000) and multiplier (25 percent), costs and interest. The defendant appealed to the Ninth Circuit Court of Appeals. As of the statutory buyout date of October 31, 2005, appellate briefing had been completed and the case was awaiting a date for oral argument.

Kelley, on behalf of Rappaport, "opined that given his experience as a litigator, the case had a buyout value ranging from 85%–95%, from which he chose a buyout value of 90% of the $900,000 recovery on October 31—in essence, a 10% risk of loss in the Ninth Circuit." Kelley based the high market value on three factors: the standard governing the issues was the deferential substantial evidence standard; the major issue on appeal, which involved exclusion of certain evidence, was not well briefed and was, thus, unlikely to result in reversal; and, with respect to mitigation of damages, the defendant-employer had failed to meet its burden to show the availability of comparable or substantially similar employment. Further, there was no risk regarding the satisfaction of a judgment because the employer was a solvent corporation and had posted an appeal bond.

With respect to the Hughes litigation, Rappaport's other expert, Goren, opined that "settlement value" was " 'frankly' the only reasonable value one can place upon ongoing litigation in the context of a buyout value under [section] 16701." Nolte, for the defense, objected to use of a settlement figure as the buyout value. Nolte opined the buyout value of the Hughes litigation was 50 percent of the value of the judgment.

The trial court credited Rappaport's expert testimony and found it was appropriate to base the valuation of the Hughes litigation contingency fee on its settlement value, in that "anyone experienced in settlement negotiations recognizes such a value as that in which each side has, at least in theory, recognized the value of the case based upon its risks and strengths, i.e., much as market decisions are made." In accordance with Rappaport's valuation, the trial court found "the Hughes receivable has a buyout value of 90% of $800,000 ($900,000 minus the $100,000 fee reduction[4]), or $720,000."

c.   *The Waksberg Litigation*

In September of 2003, GRG entered into what the trial court characterized as a "stormy litigation relationship" with Dr. Morry Waksberg, a " 'career' litigator." Dr. Waksberg was involved in substantial litigation with the United States government and Transamerica Life Insurance Company, and was also prosecuting lawsuits against three prominent law firms which had represented him in the past. GRG knew Dr. Waksberg was "difficult" but believed the firm could "manage" him. GRG undertook to represent Dr. Waksberg based on the belief that the Transamerica litigation was about to settle for approximately $11 million. Dr. Waksberg apparently indicated an inability to pay attorney fees to GRG pending settlement with Transamerica. GRG agreed to await payment and included in the retainer agreement a clause that provided GRG with 1.5 times its normal hourly rate pending settlement and payment, after which GRG would bill at its normal hourly rate.

The trial court found that "GRG had no greater ability to 'manage' [Dr.] Waksberg than did prior counsel." GRG was relieved as Dr. Waksberg's counsel in late 2004, and GRG subsequently filed lien notices in Dr. Waksberg's pending cases for fees and costs he owed. As of the buyout date, GRG's billings to Dr. Waksberg, including the 1.5 fee multiplier, amounted to $1,289,339.

As of the date Rappaport left GRG, the firm had four matters pending involving Dr. Waksberg: (1) an arbitration initiated by GRG to establish and

---

[4] The trial court found that GRG was contractually obligated to deduct $100,000 from the contingency recovery to avoid a duplication of fees.

reduce to judgment the amount of fees and costs owed; (2) a lawsuit filed by Dr. Waksberg seeking to invalidate GRG's lien rights, void the retainer agreement, and enjoin the arbitration proceedings; (3) an interpleader filed by Transamerica; and (4) a multimillion dollar action for malpractice against GRG.

Kelley, for Rappaport, opined the buyout value of the uncollected Waksberg litigation fees of $1,289,339 as of October 31, 2005, at 66⅔ percent of their value, or $859,559, of which Rappaport was entitled to 31 percent, or $266,463. Kelley considered the buyout value appropriate "because of the strength of the lien."

In contrast, Nolte valued the buyout value of the uncollected Waksberg litigation fees at zero. Unlike Kelley, who analyzed the Waksberg litigation fees apart from the contingent liability presented by Dr. Waksberg's malpractice claim, Nolte viewed them as one consolidated package. Nolte opined "the liability portion of Waksberg offset the value of the lien such that absent purchase of buyout insurance, the receivable, when coupled with the malpractice claim was unsalable."

The trial court found Nolte's approach "essentially concludes that the seller would be willing to give the asset away," and rejected the notion "that in a market with a willing buyer, and willing seller, Waksberg would be wholly without value as an asset." The trial court found, "based upon the Kelley testimony and the court's review of the facts presented, [that] the legal malpractice claim does not present a substantial impediment to obtaining some net financial recovery from the lien filed on behalf of GRG" and thus, the Waksberg litigation receivable did have value contrary to Nolte's conclusion.

Although the trial court found value in the Waksberg litigation receivable, it found no evidentiary basis for Kelley's conclusion that the buyout price for the receivable was 66⅔ percent of total fees as of October 31, 2005. Because the evidence did support the conclusion that the Waksberg litigation receivable had value but did not support the specific valuations assigned by the competing experts, the trial court adopted the mean value of the receivable, that is, 33⅓ percent of $1,289,339, or $429,779.66.

### d. The Office Space Lease Liability

Rappaport's expert, Goren, determined that Rappaport's portion of the liability for the firm's office space totaled $25,293. Nolte, appellants' expert, found that Rappaport's liability totaled $58,305. Without elaboration, the trial court determined that the total lease liability that should be apportioned to Rappaport was $37,759.

### 4. *Judgment and Appeal*

On November 17, 2008, the trial court entered judgment in favor of Rappaport for his 31 percent share of the partnership in the sum of $230,758 plus interest from November 1, 2005, to the date of judgment. (§ 16701, subd. (b).) Although the trial court did not include an explanation of how the final judgment amount was calculated in its statement of decision, we were able to recreate the calculation based on information from the record, including the parties' experts' testimony. Our calculations show that the trial court made a small mathematical error in the sum of $1,064.80.[5]

---

[5] A chart showing our calculations, including the correct amount owed to Rappaport before interest, is included below:

| | |
|---|---|
| Cash | $ 103,674.00 |
| Accounts Receivable | $ 1,406,621.66 |
| Other Tangible Assets | $ 10,000.00 |
| Partner Loans (also known as Neg. Cap. Accts.) | $ 419,882.00 |
| Security Deposit | $ 31,122.00 |
| Liabilities for Accrued Payroll | $ (27,290.00) |
| Liabilities to Gelfand and Glaser | $ (189,240.00) |
| Liabilities to Rappaport | $ (9,240.00) |
| Total Liquidation Value (Before Lease Obligation) | $ 1,745,529.66 |
| Rappaport's Interest (31 Percent) Equals | $ 541,114.20 |
| Rappaport's Share of 10/31/05 Earnings | $ 106,743.00 |
| Liability to Rappaport | $ 9,240.00 |
| Repayment of Capital Account | $ (123,612.00) |
| Rappaport's Share of Lease Liability | $ (37,759.00) |
| Repayment of Rappaport Loan | $ (9,240.00) |
| Cash Disbursed Since 10/31/05 | $ (27,419.00) |
| Dr. Creary Collection | $ (6,000.00) |
| United Licensing Collection | $ (7,500.00) |
| 401(k) Contribution | $ (18,772.00) |
| Payment to Rappaport from Hughes | $ (189,602.00) |
| Rappaport's Subrent | $ (7,500.00) |
| Correct Amount Owed to Rappaport | $ 229,693.20 |

The accounts receivable total shown in the chart is based on the determinations made by the trial court with respect to the Hughes litigation ($720,000), the Waksberg litigation receivable ($429,779.66) and the other accounts receivable ($256,842). The balance of the assets and liabilities in this chart were not in dispute before the trial court and are not challenged by appellants. Thus, we need not discuss them further in this opinion. Although the valuation of the office space lease liability was before the trial court, neither of the parties challenges that valuation on appeal.

The trial court further held that both Gelfand and Glaser, individually, as well as both limited liability partnership entities, GG and GRG, were liable for the buyout price due to Rappaport. The trial court also found in favor of Rappaport on the cross-complaint, finding that GG had failed to meet its burden to establish the elements of its causes of action for money had and received and for conversion.[6]

Appellants filed a timely notice of appeal from the judgment.

## CONTENTIONS

Appellants contend that the trial court erred in its interpretation of section 16701, subdivision (b), which requires the buyout price to be calculated by valuing the limited liability partnership's assets as if sold for liquidation value on the date of dissociation; instead, the trial court erroneously created a "construct" based upon individual assets being liquidated over time and then bringing the value "back" to October 31, 2005, the date of dissociation.

Appellants also contend that the trial court erred in entering judgment against the individual defendants because both GG and GRG are limited liability partnerships and individual limited partners in a limited liability partnership are not liable for such partnership's obligations.

## DISCUSSION

1.   *Statutory Formula for Determining Buyout Price of Dissociating Partner's Interest*

██   There is no dispute that this matter is governed by the UPA. (§ 16100 et seq.) The UPA's definition of "business" as including "every trade, occupation, and profession" (§ 16101, subd. (1)) "precludes an exception for law partnerships." (*Jewel v. Boxer* (1984) 156 Cal.App.3d 171, 177 [203 Cal.Rptr. 13] (*Jewel*).) The UPA defines "partnership" to include "a registered limited liability partnership." (§ 16101, subd. (9).)   ██   Thus, the provision at issue, section 16701, applies to registered limited liability partnerships such as GG and GRG.

██   Under the UPA, if there is a dissociation of a partner, as contrasted with a dissolution of the partnership, the remaining partners have a right to continue the business and the dissociated partner has a right to be paid the buyout price of his or her partnership interest. (§ 16701, subd. (a).) Section

---

[6] Appellants are not challenging the trial court's decision on the cross-complaint. Thus, we need not discuss it further.

16701 addresses the buyout of a partner's interest pursuant to the UPA when the partnership business is not wound up. Section 16701 provides in pertinent part: "(a) If a partner is dissociated from a partnership, the partnership shall cause the dissociated partner's interest in the partnership to be purchased for a buyout price determined pursuant to subdivision (b). [¶] (b) The buyout price of a dissociated partner's interest is the amount that would have been distributable to the dissociating partner under subdivision (b) of Section 16807[7] if, on the date of dissociation, the assets of the partnership were sold at a price *equal to the greater of* the liquidation value *or* the value based on a sale of the entire business as a going concern without the dissociated partner and the partnership was wound up as of that date. Interest shall be paid from the date of dissociation to the date of payment." (Italics added.)

■ The UPA allows partners to deviate from its default provisions by negotiating such deviations in a contractual partnership agreement. Section 16103 states at subdivision (a): "Except as otherwise provided in subdivision (b), relations among the partners and between the partners and the partnership are governed by the partnership agreement. To the extent the partnership agreement does not otherwise provide, this chapter governs relations among the partners and between the partners and the partnership."

■ Thus, parties are free to enter into their own agreements concerning the buyout of a dissociating partner's interest. However, in the absence of such an agreement, the buyout of a departing partner's interest in the partnership business is governed by section 16701. As there is no oral or written partnership agreement between the parties that governs dissociation, Rappaport's dissociation is governed by the default provisions found in section 16701.

2. *The Trial Court's Interpretation of Section 16701 Is Correct and Its Application of the Statute Was Both Reasonable and Consistent with the Statutory Language*

The focus of this appeal is section 16701, subdivision (b), which states in pertinent part: "The buyout price of a dissociated partner's interest is the amount that would have been distributable to the dissociating partner . . . *if,*

---

[7] Section 16807, subdivision (b), provides in relevant part: "Each partner is entitled to a settlement of all partnership accounts upon winding up the partnership business. In settling accounts among the partners, the profits and losses that result from the liquidation of the partnership assets shall be credited and charged to the partners' accounts. The partnership shall make a distribution to a partner in an amount equal to any excess of the credits over the charges in the partner's account. Except for registered limited liability partnerships and foreign limited liability partnerships, a partner shall contribute to the partnership an amount equal to any excess of the charges over the credits in the partner's account."

*on the date of dissociation, the assets of the partnership were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern without the dissociated partner and the partnership was wound up as of that date.*" (Italics added.)

Appellants contend that the trial court erred as a matter of law in its interpretation of section 16701, subdivision (b). Specifically, appellants make five separate arguments in support of their contention: (1) the trial court erred in permitting Rappaport to offer testimony from an accountant and a lawyer regarding the proper method of valuing GRG's assets and liabilities; (2) the trial court erred by looking to external sources of information to construe section 16701, subdivision (b), because the statute is not ambiguous; (3) the trial court erred in attempting to conform its interpretation and application of section 16701, subdivision (b), to the process a law firm would follow in an orderly dissolution; (4) the trial court erred when it failed to value the assets as if they were sold for liquidation value on the date of dissociation; and (5) the trial court abused its discretion when it admitted testimony of Goren and Kelley regarding the interpretation of section 16701, subdivision (b), and such admission is prejudicial.

■ The majority of appellants' arguments need not be addressed separately, as each can be dispensed with based on our analysis of the interpretation of the relevant statutory language. Issues involving statutory construction are questions of law and are, thus, reviewed de novo. (*SBAM Partners, LLC v. Wang* (2008) 164 Cal.App.4th 903, 907 [79 Cal.Rptr.3d 752].) "As the matter is a question of law, we are not bound by evidence on the question presented below or by the lower court's interpretation. [Citations.] [¶] The rules governing statutory construction are well settled. We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] 'In determining intent, we look first to the language of the statute, giving effect to its "plain meaning." ' [Citations.] Although we may properly rely on extrinsic aids, we should first turn to the words of the statute to determine the intent of the Legislature. [Citation.] Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.]" (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].)

■ The plain language of the statute clearly states that the buyout price to be paid a dissociating partner is the greater of the liquidation value or the value based on the sale of the entire entity as a going concern, with some restrictions, on the date of the dissociation, which, in this case, is October 31, 2005. However, in order to comply with the provisions of the statute, it is

important to understand what is meant by the term "liquidation value."[8] As that term is not defined within the statute, it is ambiguous and we turn to extrinsic aids in interpreting such term.

■ Although the legislative history around the statute's adoption is not helpful, the comments to the revised Uniform Partnership Act (RUPA), on which California's UPA is based, explain how the buyout price in section 701, subdivision (b), (the provision identical to our § 16701, subd. (b)) is to be determined. They state, in relevant part, "The terms 'fair market value' or 'fair value' were not used because they are often considered terms of art having a special meaning depending on the context, such as in tax or corporate law. 'Buyout price' is a new term. *It is intended that the term be developed as an independent concept appropriate to the partnership buyout situation, while drawing on valuation principles developed elsewhere.* [¶] *... Liquidation value is not intended to mean distress sale value. Under general principles of valuation, the hypothetical selling price in either case should be the price that a willing and informed buyer would pay a willing and informed seller, with neither being under any compulsion to deal. ...*" (RUPA (1997), § 701, com. 3, italics added.)

Review of section 16701, subdivision (b), and the interpretation of the term "liquidation value" are issues of first impression in this state. As there are no California cases interpreting section 16701, subdivision (b), we may look to other jurisdictions for guidance. (*Ameron Internat. Corp. v. Insurance Co. of State of Pennsylvania* (2010) 50 Cal.4th 1370, 1380 [118 Cal.Rptr.3d 95, 242 P.3d 1020].) Of the several states that have adopted the RUPA, we have found only one that has interpreted the RUPA section 701, subdivision (b), term "liquidation value."[9]

---

[8] The focus of the parties' expert witness testimony is on the liquidation value of Rappaport's interest in GRG. Nolte, in fact, provides no discussion or evidence of GRG's value as a going concern. Goren testified that the value of GRG as a going concern is the same as the liquidation value. Thus, we focus our discussion on the liquidation value, as did the parties, for the remainder of this opinion.

[9] The one case that we have found interpreting RUPA section 701, subdivision (b), is *Warnick v. Warnick* (2006) 2006 WY 58 [133 P.3d 997] (*Warnick*). In *Warnick*, the Wyoming Supreme Court reviewed Wyoming Statute section 17-21-701, subdivision (b), which is substantially similar to RUPA section 701, subdivision (b), and our section 16701, subdivision (b), in the context of the valuation of dissociating partner Randall Warnick's interest in the partnership of Warnick Ranches. Wyoming Statute section 17-21-701, subdivision (b), incorporates the comments to the RUPA involving willing and knowledgeable buyers and sellers under no compulsion to buy or sell, which comments are not included in the actual language of RUPA section 701, subdivision (b).

The precise issue before the court in *Warnick* was whether to deduct $50,000 in hypothetical sale expenses in calculating the hypothetical liquidation value of the partnership business. The *Warnick* court concluded that the $50,000 deduction should not be made because the business was not actually liquidated. Instead, the assets were retained by Warnick Ranches, and Randall

■ Based on our reading of section 16701, subdivision (b), and the comments to RUPA section 701, subdivision (b), we interpret "liquidation value" to mean, in this context, the sale price of the separate assets based upon their market value as determined by a willing and knowledgeable buyer and a willing and knowledgeable seller, neither of which is under any compulsion to buy or sell. Thus, for purposes of section 16701, subdivision (b), "liquidation value" does not incorporate the common definition of "liquidation," which generally implies some urgency for immediate cash. Under the remaining language of section 16701, subdivision (b), the "buyout price" is the liquidation value, as defined above, discounted to present value as of the date the partner dissociated.

■ Based on the foregoing, we conclude that the trial court's application of section 16701, subdivision (b), is consistent with this interpretation. Our interpretation contemplates variations that may result from experts' utilizing differing appraisal techniques under varying business circumstances, which we find consistent with the RUPA drafters' intent to develop the term "buyout price" as an independent concept. Goren's testimony detailed exactly how he determined the buyout price for each separate asset based on his opinion of the market value that would be paid by a willing and knowledgeable buyer when neither the buyer nor Rappaport is under any compulsion to buy or sell Rappaport's interest.[10] He explained that he valued the assets and liabilities based on their payout over time taking into consideration the risks and other issues involved and then discounted the value to the date of dissociation. Goren's testimony does not conflict with section 16701,

Warnick's dissociation from the partnership did not require the winding up of the partnership. (*Warnick, supra*, 133 P.3d at p. 1001.) The *Warnick* court explained that the "common understanding of liquidation, is '[t]he act or process of converting assets into cash,' [Citation]" but that in this context, the term *"liquidation value"* does not mean *"the amount of cash that would remain following a sale* . . . [because such interpretation] is not supported by the pertinent statutory language . . . ." (*Warnick, supra*, 133 P.3d at p. 1001, italics added.) The *Warnick* court continued, "[i]f . . . we were to interpret the term 'liquidation value' in isolation, we might envision an amount representing the net proceeds resulting from a distress sale. . . ." which is clearly precluded by the drafters' comments. (*Warnick, supra*, 133 P.3d at p. 1001.) "By providing two approaches [for valuing partnership assets], [the statute] contemplates variations that could result from differing appraisal techniques and varying business circumstances. . . . [¶] . . . [¶] . . . We find that the meaning of liquidation value . . . is best understood by comparing it to the other method provided. When contrasted with 'going concern value' it is clear that 'liquidation value' simply means the sale of the separate assets rather than the value of the business as a whole." (*Warnick, supra*, 133 P.3d at pp. 1002–1003, fn. omitted.)

[10] In contrast, Nolte's testimony before the trial court conflicted with his earlier deposition testimony in which he stated, "a distress sale generally occurs because of time limitations, and a liquidation generally has some sort of time constraints associated with it as well. They are different words but they are getting at the same general types of concepts even though they are using different words." Nolte's deposition testimony clearly shows that his technique of valuing GRG's assets was not consistent with our interpretation of section 16701, subdivision (b) and the RUPA comments thereto.

subdivision (b) but instead is an appraisal technique based on the business circumstances of a law firm with illiquid assets. As such, the trial court's reliance on Goren's technique for valuing GRG's assets and liabilities is a reasonable application of the statute.[11]

The trial court's valuation of the limited liability partnership's assets presents factual issues subject to substantial evidence review. (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 632 [108 Cal.Rptr.2d 833]; *In re Marriage of Hewitson* (1983) 142 Cal.App.3d 874, 885 [191 Cal.Rptr. 392].) As we find that there is substantial evidence in the record supporting the trial court's determination of the value of each asset in dispute, we will affirm the trial court's judgment with respect to this issue.[12]

The only remaining issue raised by appellants with respect to the issue of statutory interpretation is that the trial court abused its discretion when it admitted the testimony of Goren and Kelley regarding the interpretation of section 16701, subdivision (b), and that such admission was prejudicial. The trial court's determinations on the admissibility of expert evidence are subject to review under the deferential abuse of discretion standard. (*Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257, 273 [62 Cal.Rptr.3d 665].) The erroneous admission of evidence requires reversal of a judgment only when it results in a "miscarriage of justice." (Evid. Code, § 353, subd. (b).) The admission of improper evidence results in a miscarriage of justice only if " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [16 Cal.Rptr.3d 374, 94 P.3d 513].)

Appellants contend that Rappaport's experts were allowed to "offer opinions on legal questions and testify to valuation methodologies that fail to conform to the mandates of section 16701, subdivision (b)." We find no merit in this argument as we have determined that Goren testified as to the specific appraisal technique he used from an accounting perspective, which the trial court found to be consistent with section 16701, subdivision (b), and was not providing a legal opinion as to the meaning of the statute. Similarly, Kelley

---

[11] Our finding that Goren's technique is a reasonable application of the statute does not preclude other different appraisal techniques from being used in similar circumstances. Goren's technique is only one of many possible kinds that may be used to value a dissociating partner's interest depending on the varying business circumstances. This is consistent with the amicus curiae comments of the American Society of Appraisers, April 1, 2011, which stated that specific appraisal techniques and approaches employed by an appraiser can vary depending on the type of business being appraised, the availability of information and other transactional data.

[12] The relatively minor mathematical error in the trial court's calculation can be corrected by our modification of the judgment.

testified that he had not even read the statute at issue and there is no evidence that he offered an opinion on its meaning. Therefore, there is no basis for concluding that the trial court abused its discretion in admitting the testimony of either Goren or Kelley.

### 3. *The Trial Court Erred in Holding Gelfand and Glaser Individually Liable for the Buyout Payment due to Rappaport*

Gelfand and Glaser also contend that the trial court erred in holding them individually liable for the limited liability partnerships' obligations to pay the buyout price to Rappaport. We agree and will reverse the judgment as to those individual appellants.

Section 16701, subdivision (a), provides that "[i]f a partner is dissociated from a partnership, the *partnership* shall cause the dissociated partner's interest . . . to be purchased for a buyout price . . . pursuant to subdivision (b)." (Italics added.) Section 16701, subdivision (i), states that "[a] dissociated partner may maintain an action against the *partnership*, pursuant to subparagraph (B) of paragraph (2) of subdivision (b) of Section 16405, to determine the buyout price of that partner's interest . . . ." (Italics added.) Neither of these provisions provides for a suit against individual partners of the partnership.

Despite the clear language of section 16701, Rappaport argues that the trial court's holding Gelfand and Glaser liable was not in error. He relies on section 16405, subdivision (b), which states in relevant part: "A partner may maintain an action against the partnership *or another partner* for legal or equitable relief, with or without an accounting as to partnership business, to do any of the following: [¶] . . . [¶] (2) Enforce the partner's rights under this chapter, including all of the following: [¶] . . . [¶] (B) The partner's right on dissociation to have the partner's interest in the partnership purchased pursuant to Section *16701* or 16701.5, or to enforce any other right under Article 6 (commencing with Section 16601) or 7 (commencing with Section 16701)." (Italics added.)

This provision, however, is not dispositive of the issue as it cannot be construed in a vacuum. Section 16405 instead must be interpreted in the context of the various kinds of partnerships that are allowed under California law. Specifically, section 16405 must be construed in the context of the UPA provisions that apply to *limited liability partnerships*, which are entirely different from general partnerships, given the restrictive rules regarding the liability of limited partners that are set out in other provisions of the UPA.

The UPA provision on point is section 16306, subdivision (c), which states, "[n]otwithstanding any other section of this chapter, . . . a partner in a

registered limited liability partnership is not liable or accountable, directly or indirectly, . . . for debts, obligations, or liabilities of or chargeable to the partnership or another partner in the partnership . . . ." Section 16306, subdivision (d), goes on to state that "all or certain specified partners of a registered limited liability partnership, if the specified partners agree, may be liable in their capacity as partners for all or specified debts, obligations, or liabilities of the registered limited liability partnership if the partners possessing a majority of the interests of the partners in the current profits of the partnership, or a different vote as may be required in the partnership agreement, specifically agreed to the specified debts, obligations, or liabilities in writing, prior to the debt, obligation, or liability being incurred." Moreover, subdivision (g) provides that "[a] partner in a registered limited liability partnership is not a proper party to a proceeding by or against a registered limited liability partnership in which personal liability for partnership debts, obligations, or liabilities is asserted against the partner, unless that partner is personally liable under subdivision (d) or (e).[13]"

▇ The purchase of a dissociating partner's interest pursuant to section 16701 is clearly an obligation of the limited liability partnership that falls under section 16306 and, as such, only those limited partners who previously agreed to the imposition of debt, obligation or liability being incurred can be held personally liable under section 16701.[14] (§ 16306, subd. (c).) There is no evidence in the record that either Gelfand or Glaser agreed to be personally liable for any debts, obligations or liabilities of GG or GRG and therefore, neither can be held so liable pursuant to section 16306.

" 'In reviewing the evidence on . . . appeal all conflicts must be resolved in favor of the [judgment], and all legitimate and reasonable inferences indulged in to uphold the [judgment] if possible.' " (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 [38 Cal.Rptr.2d 139, 888 P.2d

---

[13] Section 16306, subdivision (e) provides that "[n]othing in subdivision (c) shall be construed to affect the liability of a partner of a registered limited liability partnership to third parties for that partner's tortious conduct." We have no need to discuss the details of this provision as the subdivision is irrelevant to the instant case.

[14] Under the rules applicable to general partnerships, "all partners are liable jointly and severally for all obligations of the partnership . . . ." (§ 16306, subd. (a).) Even so, "[a] judgment against a partnership is not by itself a judgment against a partner . . . unless there is also a judgment against the partner." (§ 16307, subd. (c).) In many cases, "[a] judgment creditor of a partner may not levy execution against the assets of the partner to satisfy a judgment based on a claim against the partnership unless . . . [¶] . . . [¶] . . . [the] court grants permission . . . [on a finding that the] partnership assets subject to execution are clearly insufficient to satisfy the judgment . . ." among other reasons. (§ 16307, subd. (d)(4).) Thus, even if GG and GRG were general partnerships, it isn't clear whether the judgment at issue would have been enforceable against either Gelfand or Glaser because the trial court failed to include any evidence in the statement of decision that it analyzed the issues of individual liability or the sufficiency of GG's or GRG's assets to satisfy the judgment.

1268]; see *Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) "[W]e do not reweigh the evidence, but rather determine whether, after resolving all conflicts favorably to the prevailing party, and according the prevailing party the benefit of all reasonable inferences, there is substantial evidence to support the judgment." (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 465 [46 Cal.Rptr.2d 427, 904 P.2d 834].) However, where there is no substantial evidence presented, the judgment must be reversed. (*Lane & Pyron, Inc. v. Gibbs* (1968) 266 Cal.App.2d 61, 69 [71 Cal.Rptr. 817] (stating "[t]here being no substantial evidence to support the implied findings upon which the judgment must rest, the judgment must be reversed"); see also *Andreotti v. Andreotti* (1964) 224 Cal.App.2d 533, 541 [36 Cal.Rptr. 709]; *Krause v. Apodaca* (1960) 186 Cal.App.2d 413, 420 [9 Cal.Rptr. 10].)

In the instant case, Gelfand and Glaser objected to the trial court's finding that they were each individually liable for the buyout price due to Rappaport. Rappaport, in turn, argued that they were so liable. However, there is no evidence in the record whatsoever that either Gelfand or Glaser ever agreed to be *personally liable* for any debts, obligations or liabilities of GG or GRG, as required under section 16306, subdivision (d). Because there was no evidence satisfying this statutory requirement presented to the trial court, its finding as to such individual liability cannot stand.

Rappaport's argument is based on two cases from other jurisdictions[15] to support his contention that both Gelfand and Glaser should be held personally liable under the circumstances. Although there is no case law on point in California, neither of the cases cited involve a limited liability partnership and provide no assistance to us. Therefore, pursuant to section 16306, subdivisions (c) and (d), we conclude that neither Gelfand nor Glaser can be held individually liable for payment of the buyout price to Rappaport. Accordingly, the trial court's judgment against the individual appellants Gelfand and Glaser will be reversed.

---

[15] The first case Rappaport cites is *Carroll v. Elzey* (Aug. 25, 2008, No. 59891-1-I) 2008 Wn.App. Lexis 2110, p. *4 (*Carroll*). In *Carroll*, the Washington Court of Appeals mentioned briefly in passing that, under Washington Revised Code section 25.05.250, that state's equivalent of section 16701, "[p]artnership law requires remaining members of a partnership to compensate a dissociated partner for the value of his partnership interest." (2008 Wn.App. Lexis 2110 at p. *13.) However, the partnership at issue in *Carroll* is a general partnership not a limited liability partnership. Under the rules governing general partnerships, all partners are liable for the debts, obligations and liabilities of the partnership. (§ 16306, subd. (a).) Thus, *Carroll* is inapplicable to the instant case. Similarly, the second case cited by Rappaport, *Poco Loco, LLC v. Barnes* (2006) 72 Va.Cir. 165, only mentions Virginia's version of RUPA section 701, subdivision (b) in passing in the context of a general partnership and, thus, it is also not applicable to the instant case.

## *DISPOSITION*

The judgment in favor of Rappaport and against the appellants Gelfand Rappaport & Glaser LLP and Gelfand & Glaser LLP is modified by reducing the amount of the judgment by $1,064.80 so that the correct amount of the judgment is $229,693.20 and, as so modified, the judgment is affirmed. The judgment against the individual appellants Marvin Gelfand and Steven Glaser is reversed. The parties shall bear their own costs on appeal.

Klein, P. J., and Aldrich, J., concurred.

On August 8, 2011, the opinion was modified to read as printed above.