Filed 8/6/13  Overland v. Scheper Kim & Harris CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MARK E. OVERLAND, | B243970 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC445134) |
| v. | |
| SCHEPER KIM & HARRIS LLP, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Michael Johnson, Judge.  Affirmed in part and remanded for modification in part.

Law Office of Douglas G. Gray, Douglas G. Gray; Law Offices of Mark E. Overland, Mark E. Overland, in pro. per., for Plaintiff and Appellant.

Wilson Elser Moskowitz Edelman & Dicker, David S. Eisen for Defendant and Respondent.

_____

A former partner in a four-partner law firm argues that upon dissociating he was entitled to a payout of 25 percent of the firm's value pursuant to Corporations Code section 16701.[1]  We find that the trial court did not err by determining plaintiff's share in the partnership to be 4 percent.  We also find that the trial court did not abuse its discretion by awarding plaintiff less in attorney fees than he requested.

<u>**FACTUAL AND PROCEDURAL BACKGROUND**</u>

**Facts**

The following factual summary is taken from the trial court's statement of decision.  Appellant and respondent both adopt the trial court's recitation of facts in their appellate briefs.

Overland Borenstein Scheper & Kim LLP (OBSK) was a limited liability law partnership that formed on March 15, 2004.  The partners were Mark Overland, Mark Borenstein, David Scheper, and Diann Kim.  Each was a general (or, "equity") partner of OBSK.

OBSK never had a written partnership agreement or a comprehensive oral partnership agreement.  The partners made decisions by consensus, with each partner having an equal say.

OBSK did not require capital contributions by the partners and did not accumulate working capital from year to year.  Fees and other revenue were used to pay expenses, salaries, and a fixed draw to the partners.  The firm's only property was the equipment, furniture, and supplies necessary for its operations.

None of the partners thought about partnership capital, equity, ownership shares, or any aspect of their shares of the partnership assets.  The predominate asset of the partnership was profit.  Profits were distributed to each partner at the end of every calendar year.  Some of the partnership's cash was retained for expected expenses and obligations, but most was distributed to the partners by December 31.  In the last months

---

[1]  Unless otherwise noted, all statutory references are to the Corporations Code.

of each year, partners agreed between themselves on their respective share of profits. To determine profit distributions, the partners made a consensus determination of merit, giving heavy weight to each partner's financial contribution to the firm.

Because this system for determining profit shares was merit-based, the actual profit shares differed from year to year and varied considerably among OBSK partners. Only in the partnership's first year did the partners receive roughly equal shares. Through the years, Overland received the following share of partnership profits: 2004, 25.5 percent; 2005, 16.807 percent; 2006, 18.31 percent; 2007, 12.1 percent; 2008, 8.3 percent; 2009, 4.0 percent.

In May 2009, Borenstein, one of the founding partners, resigned from OBSK and became a Los Angeles Superior Court judge. At that point, the partners had no agreement as to whether a general partner would receive compensation upon leaving the firm. Borenstein did not make any specific request for compensation, did not ask his partners to purchase his interest in the firm, and did not seek any payment in connection with his dissociation. The remaining partners ultimately agreed that Borenstein would receive deferred compensation but not any additional compensation from 2009 profits. They did not set policy by so deciding, specify any terms that would apply to other partners, or determine that the partnership would never pay any amount to a departing partner in the future.

Scheper Kim & Overland LLP (SKO) was a limited liability law partnership that formed when Borenstein dissociated from OBSK. SKO operated in the same manner as OBSK. It never had a written partnership agreement nor a comprehensive oral partnership agreement. The partners made decisions by consensus. SKO did not require capital contributions or accumulate working capital; revenues were used to pay expenses, salaries, and a fixed draw to the partners, and profits were distributed to the partners at the end of the year. At the end of 2009, the partners used the same merit-based system for dividing profits as was used by OBSK, resulting in the following profit shares: Scheper 68.0 percent; Kim 28.0 percent, and Overland 4.0 percent. In September of 2009, SKO took on a new partner, Marc Harris, who had the same rights and duties as a

3

general partner as Scheper, Kim, and Overland, but who did not receive a portion of the 2009 profits.

On February 16, 2010, Overland notified the SKO partners that he would dissociate from the firm, and he requested a buyout of his partnership interest. Kim responded to Overland's request by stating that she had consulted a partnership lawyer, Joel McIntyre, who said that it was not likely a buyout would be due because the firm's assets were far outweighed by its liabilities. McIntyre later testified at the trial in this matter, and stated that he did not recall having any discussion with Kim about Overland or the firm's finances, and did not recall giving Kim any advice of the kind she described.

Overland dissociated from SKO effective April 30, 2010. The parties stipulated that, as of that date, SKO's equity was $2,825,000. At the time he left, Overland owed the firm $21,084 for insurance premiums that had been paid on his behalf.

The partnership name became Scheper Kim & Harris LLP (SKH) after Overland left the firm. On August 27, 2010, SKH formally responded through its attorneys to Overland's request for a buyout of his partnership interest. SKH refused to pay Overland any amount, stating that the SKO partners had agreed that a dissociating partner would receive no payment for his or her interest. The partnership demanded that Overland pay $21,084 to the firm for unpaid insurance premiums.

In the final months of 2010, Scheper, Kim, and Harris made their compensation decisions for the year. They distributed the firm's profits among themselves and did not award any profits to Overland above the draw he received during the first four months of 2010.

**The trial and decision**

Overland filed this action on September 8, 2010. His operative second amended complaint was filed in February 2011. Following motions not relevant to this appeal, this action proceeded to a bench trial on a cause of action for violation of section 16701, with Overland as the plaintiff and SKH as the only remaining defendant.

Trial lasted over five days, beginning on April 16, 2012. In May 2012, the trial court issued a tentative decision and statement of decision, to which both parties lodged

4

objections.  On May 31, 2012, the trial court overruled all objections and declared the statement of decision final.

The trial court's statement of decision was exceedingly thorough.  The trial court analyzed the relevant provisions of California's Uniform Partnership Act of 1994 (UPA) (§ 16100 et seq.), and concluded that Overland was entitled to receive a portion of SKO's equity equal to his share of the firm's profits as of the date of his dissociation.  The court found that the consistent agreement and practice of the partnership was to determine the partners' respective profit shares by a consensus determination of merit, giving heavy weight to their financial contributions, and that the most reliable and just measure of Overland's share was the one determined shortly before his April 2010 dissociation—the 2009 year-end share of 4 percent.  This share translated to a buyout amount of $113,000 (4.0 percent of the firm equity of $2,825,000), less $21,084 for unpaid insurance premiums, for a total of $91,916.

Additionally, the trial court awarded attorney fees and expert expenses to Overland.  The court noted that Kim falsely told Overland that the firm had no assets.  Further, the court found Kim's testimony that the partnership lawyer, McIntyre, had told her Overland would not be owed a buyout, "entirely unbelievable."  In finding that an award of fees and expenses was appropriate, the court wrote:  "It appears that SKH has been determined to completely deny payment to Overland and has been in continual search of a factual and legal basis for doing so.  SKH has argued that Overland has taken extreme and unjustified positions during this litigation; the Court has largely agreed and has ruled accordingly.  But SKH set the tone of the litigation with its unjustified and ever-shifting denials of Overland's request for a buyout at any price."  Overland requested attorney fees, expert fees, and costs in the amount of $488,521.45.  Finding that much of those expenses were unrecoverable, the trial court awarded a total of $97,145.71 in fees and costs.

Judgment was entered on September 13, 2012.  Overland timely appealed.

## DISCUSSION

Overland appeals from the judgment on several grounds. He argues that, under the UPA, the trial court was required to award him 25 percent of the partnership value upon his dissociation. He further contends that SKH was not entitled to an offset of attorney fees based on an offer made pursuant to Code of Civil Procedure section 998, and that the trial court erroneously denied attorney fees incurred by Overland. Finally, he argues that the trial court erred in awarding prejudgment interest at the rate of 7 percent rather than 10 percent, a point that SKH concedes is correct.

## I. **The trial court's value determination was proper**

Overland contends that the question of whether the trial court correctly determined the value of his partnership interest is a purely legal one. He urges that a de novo review applies. SKH, on the other hand, argues that the trial court found that a partnership agreement controlled the issue of how much Overland would be paid for his interest, and the question of whether such an agreement existed is factual, subject to the substantial evidence standard of review.

The terms of a partnership are controlled first by the partnership agreement. If a partnership does not have an agreement, or if the agreement is silent on certain matters, then the UPA governs. "The UPA allows partners to deviate from its default provisions by negotiating such deviations in a contractual partnership agreement." (*Rappaport v. Gelfand* (2011) 197 Cal.App.4th 1213, 1225.) "[R]elations among the partners and between the partners and the partnership are governed by the partnership agreement. To the extent the partnership agreement does not otherwise provide, this chapter governs relations among the partners and between the partners and the partnership." (§ 16103, subd. (a).)

The trial court here found that the partnership did not have an agreement as to "whether" Overland was "entitled to compensation for his interest." Since there was no such agreement on this issue, the relevant UPA provision applied. Pursuant to section 16701, a partnership is to cause a "dissociated partner's interest in the partnership to be

6

purchased for a buyout price determined pursuant to subdivision (b)." Thus, the partnership had an obligation to purchase Overland's interest.

Since SKH was obligated to purchase Overland's partnership interest, the question became what the value of that interest was. Section 16701, subdivision (b), provides: "The buyout price of a dissociated partner's interest is the amount that would have been distributable to the dissociating partner under subdivision (b) of Section 16807 if, on the date of dissociation, the assets of the partnership were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern without the dissociated partner and the partnership was wound up as of that date." In turn, subdivision (b) of section 16807 states in relevant part: "Each partner is entitled to a settlement of all partnership accounts upon winding up the partnership business. In settling accounts among the partners, the profits and losses that result from the liquidation of the partnership assets shall be credited and charged to the partners' accounts. The partnership shall make a distribution to a partner in an amount equal to any excess of the credits over the charges in the partner's account." Therefore, the buyout price is dependent on how much would remain in the partner's account following the settlement process required by section 16807, subdivision (b).

To determine the balance of a partner's account, one must look at the partner's share of profits and losses. Section 16401, subdivision (a)(1), states that a partner's account includes "the partner's share of the partnership profits." Further, Comment No. 3 to section 807 of the Uniform Partnership Act, the model provision upon which section 16807 is based, states: "[P]rofits and losses resulting from the liquidation of the partnership assets must be credited or charged to the partners' accounts, according to their respective shares of profits and losses." (6 West's U. Laws Ann. (2001) U. Partnership Act, com. to § 807, p. 207.) Thus, reading section 16701, subdivision (b), in conjunction with section 16807, subdivision (b), it is clear that the amount Overland was to receive upon dissociation was dependent on his "share" of partnership profits.

The parties stipulated that the value of the partnership was $2,825,000 on the date of Overland's dissociation. Overland argues that he should have been awarded 25

7

percent of that amount, because section 16401, subdivision (b) states: "Each partner is entitled to an equal share of the partnership profits and, subject to Sections 16306 and 16957, is chargeable with a share of the partnership losses in proportion to the partner's share of the profits." This section could possibly apply, however, only if there was no agreement as to what Overland's share was. (See § 16103, subd. (a).)

We agree with SKH that the trial court made the factual determination that the parties *agreed* on what Overland's share was. Consequently, our review is not strictly de novo, as urged by Overland, but instead we examine whether substantial evidence supported the trial court's conclusion. (See *Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 935.) "Where [the] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358.)

The trial court supported its decision that Overland was entitled to a buyout price equivalent to 4 percent of the firm equity as follows: "Overland contends that his buyout price under § 16701(b) should be based upon a share of SKO's profits that is equal to his other partners. . . . There is no factual support for this position, and it is contrary to the clear intention of the partners. Except for the first year of operation, the OBSK and SKO partnerships never distributed their profits in equal shares. The partners always determined their profit shares by a consensus determination of merit, giving heavy weight to the partners' financial contributions to the firm. This resulted in vastly different profit shares. Adopting Overland's equal share approach would be directly contrary to the consistent agreement and practices of the partnership. . . . [¶] The partners of OBSK and SKO never distributed their profits in equal shares, and imposing that approach in this case would be entirely inconsistent with the partners' agreement and intent. . . . Using the firm's actual profit share is particularly appropriate in this case, because the distributable assets of SKO (like OBSK) were based on profits from the firm's collections and not from property, capital accounts or other assets contributed by the partners."

8

The trial court correctly recognized that a partnership agreement can be written, oral, or implied. (§ 16101, subd. (10).) Substantial evidence supported the conclusion that by oral and implied agreement each partner had an individual, unique share of profits largely dependent on his or her financial contribution to the firm. Awarding Overland 25 percent of the partnership value, as he sought, would have been contrary to this agreement.

Having found that Overland had a unique share, the trial court analyzed the evidence to determine what that share was. Substantial evidence supported the trial court's conclusion that Overland's share was 4 percent. The court had a number of different percentage shares to choose from in making its decision. For example, in 2007, Overland received 12.1 percent of partnership profits, in 2008 he received 8.3 percent, and in 2009, 4.0 percent. The court did not err by selecting the 2009 share of 4 percent, given that it was determined only several months before Overland's dissociation.[2] As noted by the trial court, because the firm's distributable assets were composed almost entirely of profits, not capital accounts or assets contributed by the partners, the 2009 profit share was a particularly appropriate measure to use.[3]

## II. The fee award was appropriate

In the context of a buyout dispute, the court may assess reasonable attorney fees and costs, "in amounts the court finds equitable, against a party that the court finds acted arbitrarily, vexatiously, or not in good faith." (§ 16701, subd. (i).) The trial court relied

---

[2]    Because substantial evidence supported this conclusion, we need not determine the propriety of the trial court's further conclusion that this was the "most equitable" measure of Overland's share.

[3]    In any event, because Overland failed to submit the reporter's transcript in connection with his appeal, he is precluded from arguing that the evidence supports an alternative percentage. (See *Stasz v. Eisenberg* (2010) 190 Cal.App.4th 1032, 1039 [in absence of required reporter's transcript, we presume the judgment is correct]; *Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 189.)

on this provision in assessing $97,145.71 in fees and costs against SKH and in favor of Overland.

Overland sought to recover $488,521.45 in fees and costs. He argues that the trial court erred by refusing to award fees and costs he incurred after SKH made a settlement offer under Code of Civil Procedure section 998 of $359,000, which Overland rejected. Citing *In re Marriage of Green* (1989) 213 Cal.App.3d 14, 24, in which it was held that Code of Civil Procedure section 998 does not apply to family law cases because the trial court has much broader authority to award fees and costs than in typical civil cases, Overland argues that Code of Civil Procedure section 998 could not apply in the instant case, because section 16701, subdivision (i), vests the trial court with broad equitable authority to award fees and costs.

There is no need for us to determine whether Code of Civil Procedure section 998 applies to a fees and costs award under section 16701, subdivision (i), however, precisely because subdivision (i) vests the trial court with broad equitable authority. In its ruling on the fees award, the trial court stated that, in light of the settlement offer, it would reduce Overland's request to the amount ultimately awarded, even if Code of Civil Procedure section 998 did not apply. Given the record before us, we cannot say that the trial court abused its discretion by awarding an amount of fees and costs that it determined was equitable. (See *Meister v. Regents of University of California* (1998) 67 Cal.App.4th 437, 450 [trial court's denial of attorney fees incurred after settlement offer was made was not arbitrary or irrational].)

Overland's further contention that he should have been awarded fees for the time he spent representing himself also fails. The fact that Overland was not the lead attorney on this case, and simply assisted his own attorney in researching and drafting legal documents, does not distinguish this matter from the long line of cases holding that an attorney representing himself may not recover from an opposing party for the time he spends litigating a matter on his own behalf. (See *Trope v. Katz* (1995) 11 Cal.4th 274, 284-285; *Taheri Law Group v. Evans* (2008) 160 Cal.App.4th 482, 493-494; *Witte v. Kaufman* (2006) 141 Cal.App.4th 1201, 1207-1210.)

10

Accordingly, we find that the trial court's fees and costs award was proper.[4]

## III. **Prejudgment interest**

Lastly, appellant contends that the trial court erred by awarding prejudgment interest at the rate of 7 percent. As SKH correctly concedes in its respondent's brief, section 16104, subdivision (b), provides that, in cases in which an obligation to pay interest arises under the UPA and the interest rate is unspecified, the rate shall be as specified in Civil Code section 3289, i.e., 10 percent.

On remand, therefore, the trial court shall correct the judgment to reflect a prejudgment interest rate of 10 percent.

## DISPOSITION

The matter is remanded to the trial court for modification of the judgment to reflect a prejudgment interest rate of 10 percent. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.


FERNS, J.*

---

[4] SKH's motion for judicial notice filed on April 24, 2013, is granted.

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.